# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
### MACON DIVISION

| | |
|---|---|
| **HUSAM ALDIM MATHEWS,** | |
| *Plaintiff,* | **CIVIL ACTION NO.** |
| **v.** | **5:22-cv-00397-TES** |
| **WALMART, INC.,**[1] | |
| *Defendant.* | |

## ORDER GRANTING DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

In this action against Defendant Walmart, Inc., pro se Plaintiff Husam Aldim Mathews seeks to recover damages for violations of federal law he allegedly suffered during his employment with the retail conglomerate. Plaintiff claims that Walmart violated Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, by terminating his employment, failing to promote him, subjecting him to unequal terms and conditions of employment, and retaliating against him. [Doc. 1, pp. 3–4].

---

[1] Plaintiff also sued three individuals with whom he worked, but he later stated that "they're not the defendants" and that "Walmart . . . is the only defendant." [Doc. 19, p. 1 (quoting FTR Audio Recording at 3:31.05–3:31.49, *Mathews v. Walmart, Inc.*, 5:22-cv-00397-TES (M.D. Ga. Oct. 12, 2023))]. So, based not only on Plaintiff's consent to do so, but on applicable law as well, the Court terminated those individuals as parties to this lawsuit. [*Id.* at pp. 1–2 (first citing *Dearth v. Collins*, 441 F.3d 931, 933 (11th Cir. 2006) (relief under Title VII is available against only the employer and not against individual employees regardless of whether the employee is a public entity or a private company); then citing *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991) (individual capacity suits under Title VII are inappropriate; relief is to be found from the employer))].

## PROCEDURAL BACKGROUND

Following a rather convoluted discovery period, Walmart presented the Court with a dispositive motion on Friday, February 9, 2024, that seeks summary dismissal of each and every one of Plaintiff's claims. [Doc. 42]. That same day, Plaintiff submitted a written filing entitled: "Oral Argument Against Walmart's Dispositive Motion" [Doc. 48].[2] Then, the following Monday, February 12, 2024, the Clerk of Court, as he does with all cases involving a pro se party, sent Plaintiff a Notice of Summary Judgment Motion [Doc. 47]. Not only did the Clerk inform Plaintiff of the response deadline and "provide[] detail as to how summary judgment . . . operates," but he also specially mentioned *and advised* Plaintiff of the requirements of Local Rule 56. [Doc. 47, p. 1]; [Doc. 52, p. 1].

On Friday, March 8, 2024, Plaintiff submitted another filing. [Doc. 51-3; *see also* [Doc. 47, p. 1 (noting Plaintiff's 30-day response deadline)]. This filing was clearly aimed at responding to Walmart's dispositive motion in light of the Clerk's Notice of Summary Judgment Motion, but when taken together with Plaintiff's written "Oral Argument Against Walmart's Dispositive Motion," it "impermissibly expand[ed] his page limitation to oppose summary judgment." [Doc. 52, pp. 1–4]. Additionally, Plaintiff's submission aimed at responding to Walmart's Statement of Material Facts

---

[2] Plaintiff hand delivered his "Oral Argument Against Walmart's Dispositive Motion" on Friday, February 9, 2024. After processing and scanning, it was filed on Monday, February 12, 2024.

[Doc. 42-3] was a real mess. [Doc. 51-4]. So, to ensure fairness, the Court struck all three noncompliant filings (as well as their attachments) and ordered Plaintiff to rework them so that they conformed to the page limitations and other requirements proscribed by the Court's Local Rules. [Doc. 52]; LR 7.4, MDGa; *see Travelers Prop. Cas. Co. of Am. v. CVB Indus. Contracting, Inc.*, 697 F. Supp. 3d. 1334, 1340–41 (M.D. Ga. Oct. 6, 2023).

Plaintiff streamlined his Response [Doc. 53-2] into one brief as ordered. Still though, despite clear guidance on how to follow—and thus, comply—with Local Rule 56, Plaintiff ignored most of that guidance and resubmitted what can only be generously termed as "loose" compliance with his obligations. [Doc. 52, pp. 4–6]; *see generally* [Doc. 53-1]; [Doc. 53-3]. Yes, Plaintiff is proceeding pro se in this action, and that, of course, brings with it certain leniencies. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed pro se is to be liberally construed, and a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers[.]") (internal quotations and citations omitted). However, the fact that Plaintiff is acting as his own attorney does not relax his obligation to conform to procedural rules like the Federal Rules of Civil Procedure or the Court's Local Rules. *Albra v. Advan, Inc.*, 490 F.3d 826, 829 (11th Cir. 2007) (quoting *Loren v. Sasser*, 309 F.3d 1296, 1304 (11th Cir. 2002)) ("And although we are to give liberal construction to the pleadings of *pro se* litigants, "we nevertheless have required them to conform to procedural rules."). Specifically, Local Rule 56 serves a "vital function" and is intended

3

to guide and streamline the organization of evidence so that district judges can more speedily resolve motions brought pursuant to its larger counterpart, Federal Rule of Civil Procedure 56. *Reese v. Herbert*, 527 F.3d 1253, 1268 (11th Cir. 2008) (first citing *Caban Hernandez v. Philip Morris USA, Inc.*, 486 F.3d 1, 7 (1st Cir. 2007) ("Given the vital purpose that such rules serve, litigants ignore them at their peril."); then citing *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("[J]udges are not like pigs, hunting for truffles buried in briefs.")); *see also Murthy v. Missouri*, 144 S. Ct. 1972, 1991 n.7 (June 26, 2024) (quoting *Gross v. Cicero*, 619 F.3d 697, 702 (7th Cir. 2010)).

So, notwithstanding Plaintiff's failure to—not all the time, but most of the time—comply with Local Rule 56, Walmart's summary-judgment motion has been fully briefed and is ripe for consideration.[3] The Court denied Plaintiff's request for oral argument "in court or by phone," opting to rule solely on the written arguments submitted by him and Walmart. [Doc. 49, p. 2]; [Doc. 52, pp. 6–7]. For the following reasons, the Court **GRANTS** Walmart's Motion for Summary Judgment [Doc. 42].

A.    <u>Local Rule 56</u>

Before getting to the facts, the Court must discuss Local Rule 56's requirements

---

[3] Plaintiff filed an additional brief without leave of Court, prompting a Notice of Deficiency from the Clerk. Even though the Court provided Plaintiff with its Local Rules in a prior Order [Doc. 52], it wasn't until *after* Plaintiff received the Notice of Deficiency that he sought leave to file a surreply. [Doc. 52, n.1]; [Doc. 59]. The Court, however, denied leave since "Plaintiff failed to comply with Local Rule 7.3.1 concerning surreplies," despite having been specifically directed to its Local Rules. [Doc. 52, n.1]; [Doc. 60]; *see also* LR. 7.3.1, MDGa. As it has done with Plaintiff's other filings that are in contravention with its Local Rules, the Court **STRIKES** Plaintiff's Surreply [Doc. 58] and notes for the record that it did not consider it in any way in ruling on Walmart's summary-judgment motion. *See, e.g.*, [Doc. 52, pp. 1–6].

because a failure to adhere to them can be detrimental (and often fatal) to a party's lawsuit. Local Rule 56 clearly mandates that a party responding to a motion for summary judgment must respond to "each of the movant's numbered material facts." LR 56, MDGa. Further, it instructs that "[a]ll material facts contained in the movant's statement which are not specifically controverted by *specific citation to particular parts* of . . . the record shall be deemed to have been admitted, unless otherwise inappropriate."[4] *Id*. (emphasis added). Local Rule 56 also preempts a nonmoving party's claim of insufficient knowledge unless the party has "complied with the provisions of Rule 56(d) of the Federal Rules of Civil Procedure." *Id*. Lastly, as an overarching principle, the Court does not consider "statements in the form of issues or legal conclusions." *Id*.

Local Rule 56 "isn't new, and it certainly isn't some recent requirement that the Court deviously sprung on [parties] in order to trick or trap them. No, Local Rule 56 is a longtime requirement with which all litigants must comply."[5] *Hall-Gordon v. Bibb Cnty. Sch. Dist.*, No. 5:21-cv-00143-TES, 2022 WL 3704917, at *1 (M.D. Ga. Aug. 27, 2022); *aff'd Gordon v. Bibb Cnty. Sch. Dist.*, No. 22-13286, 2023 WL 8253881, at *1–2 (11th Cir. Nov. 29, 2023). And, again, its purpose is clear: it "protects judicial resources by 'mak[ing] the parties organize the evidence rather than leaving the burden upon the district judge.'"

---

[4] "Where possible," Local Rule 56 also encourages the use of "dates, specific page numbers, and line numbers." LR 56, MDGa. And, as shown below, it was certainly possible for Plaintiff to have done so.

[5] *See Weil v. Neary*, 278 U.S. 160, 169 (1929) (holding that local rules have the "force of law").

*Reese*, 527 F.3d at 1268 (quoting *Alsina-Ortiz v. Laboy*, 400 F.3d 77, 80 (1st Cir. 2005)).[6]

Now, before all of this comes off as some brazen, "you didn't do anything right" admonition, Plaintiff did take a stab at making his Statement of Material Facts Response [Doc. 53-1] more concise, as instructed. [Doc. 52, pp. 4–6]. That was about it, though. When it comes to the rest of Local Rule 56, Plaintiff made little to no effort to use "specific citation to particular parts of . . . the record," and he fell woefully short of ensuring that most of his material "facts" didn't take the form of legal conclusions. LR 56, MDGa.

Walmart offered 92 concise statements of material facts, and Plaintiff either objected to or denied all 92 of them. [Doc. 42-3]; [Doc. 53-1]. As for controverting Walmart's proffered material facts with "specific citation to particular parts of . . . the record" by referencing specific page numbers and line numbers to the depositions cited—well, Plaintiff didn't bother with that requirement. LR 56, MDGa. To be clear, the fact that Plaintiff didn't agree with any of Walmart's proffered facts has nothing to do with whether he complied with Local Rule 56. The problem is that the Court told Plaintiff how to properly controvert proffered factual statements, and he flat-out ignored that guidance. [Doc. 52, p. 5]. Unphased by how such a failure could affect his lawsuit, Plaintiff adorned his Statement of Material Facts Response with repeated uses

---

[6] *See also Libel v. Adventure Lands of Am., Inc.*, 482 F.3d 1028, 1032 (8th Cir. 2007) ("Courts have neither the duty nor the time to investigate the record in search of an unidentified genuine issue of material fact to support a claim or defense.").

6

of broad, general citations such as: "see" "witness affidavits," "all witness affidavits," "DOL transcripts,"[7] and cited to his deposition with page numbers but no line numbers. [Doc. 52, pp. 5-6 (citing *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991))]; *see generally* [Doc. 53-1]. Of course, the Court overlooks the minor inconvenience caused by a lack of citation to line numbers in a deposition, but it cannot and will not overlook Plaintiff's otherwise clear intent to flout Local Rule 56's requirements. *See, e.g.*, [Doc. 53-1, ¶¶ 11A–12A]. Let's highlight just a few.

Right out of the gate, Plaintiff told the Court to "see [the] affidavits" of five individuals without the slightest effort to direct the Court to where those affidavits could be found on the record. [Doc. 53-1, ¶ 1A]. Plaintiff repeated this improper citation practice for just about every one of his efforts to controvert Walmart's proffered facts. Just to demonstrate the sheer importance of Local Rule 56's "specific citation" requirement and the clear frustration that comes from not complying with it, the Court notes that many of those affidavits weren't even included with Plaintiff's materials opposing summary judgment. One was tucked way down in the pleadings stage of this lawsuit, while others were randomly placed on the record during discovery. *See, e.g.*, [Doc. 2-2, Kurt Aff., p. 2]; [Doc. 16-1, Roman Aff., pp. 1–2]; [Doc. 16-2, Jackson Aff., p. 1]. Another one, the Court previously struck, and Plaintiff neglected to refile it

---

[7] As an exhibit to his Response, Plaintiff submitted a 16-page transcript of an administrative hearing before the Georgia Department of Labor. [Doc. 54-2].

notwithstanding the Court's caution that it would "need to be refiled" if he wanted the Court to consider it. *See, e.g.*, [Doc. 51-7, pp. 1–9]; [Doc. 52, p. 2 n.3]. Hunting for a Plaintiff's affidavits and what he wants the Court to extract from them—when it's his responsibility to streamline evidence by using proper citations—is not the type of hunting this Court enjoys. So, suffice it to say, the Court didn't drudge through the record to find whatever factual disputes Plaintiff thinks may be unearthed by the nitty-gritty substance of his elusive affidavits. *See Murthy*, 144 S. Ct. at 1991 n.7; *Reese*, 527 F.3d at 1268; *Lamz*, 321 F.3d at 683. It's his job to point that stuff out to the Court.

One might hope that Plaintiff's noncompliance with Local Rule 56 ended there, but it didn't. Instead of "specifically controvert[ing]" Walmart's proffered statements, Plaintiff tried to chip away at them by using textbook legal conclusions. LR 56, MDGa. Thus, in accordance with Local Rule 56, when Plaintiff masqueraded a legal conclusion as a "fact," the Court did not consider it. *See id.* For example, Plaintiff abundantly scattered statements throughout his Statement of Material Facts Response that Walmart "took adverse disciplinary action" against him, "illegally terminated" him, "denied [him] equal rights" or "opportunity," "retaliated" against him, and that certain actions by Walmart "create[d] a hostile work environment," "established gender discrimination," or constituted "pretext." *See inter alia* [Doc. 53-1, ¶¶ 3A, 11A, 17A, 18A, 19A, 36A, 66A]. Each of those are legal conclusions that do not belong in a response to a party's statement of material facts.

The Court isn't picking on Plaintiff; it has taken this same tack against other litigants who ignored its Local Rules. For example, in a similar lawsuit that involved clear noncompliance with Local Rule 56, this Court found that such practice comes with a consequence. *Hall-Gordon*, 2022 WL 3704917, at *2 (holding that a party "just can't dump . . . documents on the Court, sprinkle in a few legal conclusions, embed a few legal arguments, and expect the Court and opposing counsel to sift through it all in order to cobble together his . . . position[]"). When a party violates Local Rule 56, he does so at his own peril, and it is not an abuse of discretion to—where appropriate— deem statements of material fact undisputed because of a deficient response under Local Rule 56. *Id.* at *3; *Caban Hernandez*, 486 F.3d at 7; *see also Gordon*, 2023 WL 8253881, at *2. Thus, "the Court deems those asserted material facts that weren't properly controverted as admitted." *Hall-Gordon*, 2022 WL 3704917, at *3 (citing *Jones v. Gerwens*, 874 F.2d 1534, 1537 n.3 (11th Cir. 1989)). Accordingly, Plaintiff's nonspecific citations to various affidavits simply don't cut it, leaving the Court to admit the overwhelming majority of the facts offered by Walmart in its Statement of Material Facts.[8] With that, let's see how the facts shake out. *See Reese*, 527 F.3d at 1268 (noting that "[a]pplication of [a local rule] does not, however, automatically entitle the movant to summary judgment").

---

[8] Since nearly all of Plaintiff's responses are deficient under Local Rule 56, the Court, unless otherwise noted, deems every fact in Walmart's Statement of Material Facts admitted.

## FACTUAL BACKGROUND

As an equal-opportunity employer, Walmart has adopted a policy that prohibits discrimination or harassment by or against any of its members, associates, applicants for hire, and customers. [Doc. 42-3, ¶ 1]. That policy also prohibits Walmart from taking negative action against an associate who reports conduct that violates the policy or speaks out against discrimination or harassment. [*Id.* at ¶ 2]. Along those lines, Walmart has another policy designed to provide instruction and assistance should associates either violate a Walmart policy or perform their job duties below Walmart's reasonable expectations. [*Id.* at ¶ 3].

Under this second policy, there are four levels of disciplinary action, and the first three levels each have their own corresponding color. [*Id.* at ¶ 4]. The first, second, and third levels consist of written warnings ranging from yellow, to orange, and then to red. [*Id.*]. Each color warning stays "active" for a period of 12 months. [*Id.* at ¶ 5]. The fourth disciplinary level is termination. [*Id.* at ¶ 4]. To guarantee that associates are adequately performing in their current positions, those with an "active" orange warning or higher are ineligible to apply for a promotion. [*Id.* at ¶ 6]; [Doc. 44-22, p. 1].

The underlying facts of this case occurred at a Walmart store located in Warner Robins, Georgia. [Doc. 42-3, ¶¶ 11]. On October 3, 2016, Walmart initially hired Plaintiff as an associate tasked with unloading general merchandise, but he didn't stay in that role for very long. [*Id.*]; [Doc. 44, Mathews Depo., p. 12, 43:16–24]. With a disagreement

over job performance, Walmart fired Plaintiff, but then brought him back as a sales associate in December of 2017. [Doc. 42-3, ¶ 12]; [Doc. 44, Mathews Depo., pp. 12–16, 43:16—61:22]. In May of 2018, Walmart hired Damon Manning who, like Plaintiff, is a black male. [Doc. 42-3, ¶ 13]; [Doc. 1-1, p. 1]. Manning was hired as the store manager, and when he started, Plaintiff asked him how he could advance within the company. [Doc. 42-3, ¶ 14]. According to Plaintiff's deposition testimony, Manning assured him that he would help Plaintiff get to "where [he] was trying to go." [*Id.* at ¶ 15]; [Doc. 44, Mathews Depo., p. 27, 103:6–11]. Manning informed Plaintiff of an open managerial position tasked with overseeing two departments and encouraged him to apply. [Doc. 42-3, ¶ 17]. The first department, Department 82, consisted of candy and related snacks for the candy aisle and other locations throughout the store. [*Id.* at ¶ 20]. The second, Department 1, dealt with merchandise—candy, cigarettes, lighters, etc.—at the front of the store and around the cash registers. [*Id.*]. Although Plaintiff testified that he really wasn't interested in this position, he nevertheless pursued it. [Doc. 44, Mathews Depo., pp. 27–28, 104:23–25; 106:16–23].

On September 25, 2018, Manning promoted Plaintiff to the position. [Doc. 42-3, ¶ 16]; [Doc. 44, Mathews Depo., p. 27, 104:18–21]. However, because of his degrees, Plaintiff thought that he should have been hired for a management role on a higher level—one that was more "in alignment with [his] accolades." [Doc. 42-3, ¶ 18]; [Doc. 44, Mathews Depo., p. 27, 105:21–23]. According to Plaintiff's deposition, he has a

Bachelor of Science from Macon State College and was working on some other degrees while employed at Walmart. [Doc. 44, Mathews Depo., pp. 10–11, 37:13—40:18]. Plaintiff further testified that he completed his Master of Business Administration and attained a doctorate in Business Administration with a specialization in Human Recourses "[b]ack in 2019." [*Id.* at p. 31, 118:17–119:12]. Before seeking to advance to those higher management roles, though, Manning counseled Plaintiff to "work his way up" by demonstrating success in the current managerial role he had been given. [Doc. 42-3, ¶ 19]; [Doc. 44, Mathews Depo., p. 27, 103:21–25]. In that role, Plaintiff was responsible for the operation of his departments which included arranging, organizing, and stocking items; rotating out-of-date items; maintaining store displays; and ensuring that items were priced appropriately. [Doc. 42-3, ¶ 21].

From these managerial responsibilities come two main tasks. First, Plaintiff had to perform Modulars, or "Mods," that were received on a handheld computer with a deadline for completion. [*Id.* at ¶¶ 22, 25]. The Mods would show how and where items for a specific department should be placed and would provide instructions for stocking new items or reducing an item's price with one of Walmart's widely known "Rollback" labels. [*Id.* at ¶¶ 22–24]. Plaintiff, just like other department managers, was responsible for confirming the timely completion of his Mods. [*Id.* at ¶ 25]. Second, each department had its own "bins" containing items that had been delivered to the store but did not yet have an in-store stocking location. [*Id.* at ¶ 27]. As a department manager, Plaintiff,

using his handheld computer, was responsible for "working" or "capping" those "bins" by scanning their contents for items that were specific to his departments. [*Id.* at ¶¶ 26, 28]. Much like the responsibilities for completing Mods, department managers would receive instructions on their handheld computers about where to stock those items and how to label them. [*Id.* at ¶ 28].

When Plaintiff became a department manager, he reported to Ashley Marshall, a black female, who, as an assistant store manager, could issue disciplinary action warnings. [*Id.* at ¶¶ 29–30]. Plaintiff had only been a department manager for a little more than a month when Marshall issued him a yellow warning for poor job performance. [*Id.* at ¶¶ 16, 30]. This yellow warning stated that Plaintiff "was given tasks last week to ensure that [Department 82] was in stock[,] . . . [had] no missing labels[,]" and "that all of the . . . [M]odulars [for Department 82] were completed in a timely manner." [*Id.* at ¶ 32]; [Doc. 45, Manning Decl., ¶ 17]; *see, e.g.*, [Doc. 45-5, p. 2]. Marshall also made a note on the yellow warning that Plaintiff's Modulars for Department 82 "[were] currently late" as of October 29, 2018—the date the warning was issued and acknowledged by Plaintiff. [*Id.* at ¶ 32]; [Doc. 45-5, p. 2]. As to what was expected of Plaintiff going forward, the yellow warning stated that he "is expected to ensure that the department is up to the company standards." [Doc. 42-3, ¶ 33]; [Doc. 45-5, p. 2].

In early 2019, Plaintiff began to report to a different assistant store manager,

Damon Reeves. [Doc. 42-3, ¶ 34]. On March 9, 2019, Reeves, a black male, issued Plaintiff a second disciplinary action—an orange warning—because of his failure to complete his job duties. [*Id.* at ¶¶ 34–35]. So, once again, Plaintiff's poor job performance took front and center. Generally speaking, this orange warning detailed problems related to stocking procedures and noted that Plaintiff was not following Walmart's processes "at all." [*Id.* at ¶ 36]; [Doc. 45, Manning Decl., ¶ 19]; *see, e.g.,* [Doc. 45-6, p. 2]. More specifically, the orange warning noted that Plaintiff's "[M]ods [were] not up to standard," that his bins had missing labels, that one [M]od took him a whole eight-hour shift to complete, and that his "stock [was] not up to company standard also." *See, e.g.,* [Doc. 45-6, p. 2]. All in all, Plaintiff had "a number of issues that [were] being addressed"—issues concerning not only his job performance and productivity but his insubordination and disrespect to his supervisors as well. *See, e.g.,* [*id.*]; *see also* [Doc. 42-3, ¶ 37]. Then, as to what was expected of Plaintiff following the orange warning, Reeves wrote that "[l]earning and understanding" the process for Plaintiff's responsibilities would "ensure" the performance improvements necessary for him to rise to the department-manager level. [Doc. 45, Manning Decl., ¶ 20]; [Doc. 45-6, p. 2].

Even though Plaintiff refused to acknowledge the contents of the orange warning—because he obviously disagreed with what was said, he still testified that he recalled receiving the warning as well as Reeves' comments about his disrespect and insubordination. [Doc. 42-3, ¶ 39]; [Doc. 44, Mathews Depo., pp. 21–22, 80:14—84:15].

Whether Plaintiff agreed with what was written in the orange warning, the evidence provided by Walmart indicates that his performance didn't improve. [Doc. 42-3, ¶¶ 40–41]. At one point, "Manning and Reeves discovered that Plaintiff was confirming on his handheld [computer] that his Mods were completed, but when they examined his area," they found that "he had not completed them or that they were done incorrectly." [*Id.* at ¶ 42].

In June 2019, there was an opening for a lead position in human resources at the store located in Perry, Georgia. [*Id.* at ¶¶ 72–73]. Even though Plaintiff was unable to apply for the position because of his active orange disciplinary warning, he still made it known that he would have, at least, liked the opportunity to apply. [*Id.* at ¶¶ 4–6, 72–73]; [Doc. 44-7, p. 2]; [Doc. 44, Mathews Depo., p. 31, 120:6–11]. The position, however, was given to a woman by the name of Aurora Patterson who, like Plaintiff, worked with him as a department manager. [Doc. 42-3, ¶ 73]; [Doc. 44, Mathews Depo., p. 54, 213:16–25]. Unlike Plaintiff, though, Patterson didn't labor under any disciplinary warnings. [Doc. 44-7, p. 2].

On June 29, 2019, Reeves issued Plaintiff his next disciplinary warning level. [*Id.* at ¶ 43]. Based on Plaintiff's refusal to follow directives regarding his work, his failure to complete tasks, and for his conduct, this red warning stated:

> [Plaintiff] has let his area get out of control[.] His freight is overflowing out of his bins. He is not finishing freight in a timely man[ner]. When instructed to perform his job, [Plaintiff] constantly refuses to do what is asked of him. [Plaintiff] only has two trucks a week and never finishes his freight in the

same day. [Plaintiff] was also given a deadline on finishing his [Department] 1 [M]od on [June 26, 2019][,] and he was given these instructions on the 20th and/or 21st of the month. It is now [June 28, 2019][,] and the [M]od still has not been completed. [Plaintiff] has misc[ellaneous] carts left all over the [back room]. [Plaintiff] has not pulled any of his deleted items from the [M]od. [Plaintiff] has replaced all of his labels without moving any candy. This is not meeting standards for Mod Integrity.

[*Id.* at ¶¶ 43–44]; [Doc. 45, Manning Decl., ¶ 22]; *see, e.g.*, [Doc. 45-7, p. 2]. All of this caused "everything [to] back[] up." [Doc. 42-3, ¶ 45]. Plaintiff's bins would get "fuller day by day," and his inability or refusal to "sift his candy along with placing the labels correctly, . . . causes confusion for the customer" and fellow associates. [*Id.*].

According to Plaintiff, most everything written in his warnings was a lie—simple pretext to cover up Walmart's alleged discrimination and retaliation. [Doc. 53-1, ¶ 44A]. Time and time again Plaintiff states that he "completed [M]ods on time," but Walmart, however, found that "he had simply replaced labels on the shelves without moving the candy items as directed by the Mod." [*Id.* at ¶ 45A]; [Doc. 42-3, ¶ 47]. Very much like the expectations from the yellow and orange warnings, the red warning noted that Plaintiff "must follow . . . directions better." [Doc. 42-3, ¶¶ 33, 38, 46]. Despite admitting that the red warning reflected "[s]omething to that nature," Plaintiff still had the same performance issues throughout 2019. [*Id.* at ¶ 49]; [Doc. 44, Mathews Depo., pp. 32–33, 125:6—127:6].

In September 2019, Jackson Hopkins, a white male, began to supervise Plaintiff. [Doc. 42-3, ¶ 50]. At the time he and Plaintiff worked together, Hopkins was a front-end

manager. [Doc. 46, Hopkins Decl., ¶ 4]. After becoming Plaintiff's supervisor, Hopkins quickly noticed the serious deficiencies in Plaintiff's performance—so much so that Hopkins "d[id] not believe that [Plaintiff] had a good work ethic." [*Id.* at ¶ 5]; [Doc. 42-3, ¶ 51]. Hopkins observed that Plaintiff failed to finish his daily tasks, that he was "frequently late" when it came to completing his job responsibilities, and that whenever management would try to give him some direction, Plaintiff became very defensive and disrespectful. [Doc. 46, Hopkins Decl., ¶ 5]; [Doc. 42-3, ¶¶ 52–53].

It's apparent that Plaintiff's issues weren't met with any noticeable improvement because in the early part of 2020, Hopkins believed that Walmart should terminate Plaintiff's employment. [Doc. 42-3, ¶ 54]. After all, Plaintiff was still under an active red warning for similar issues. [*Id.* at ¶¶ 5, 54]. However, after discussing Plaintiff's poor performance and attitude with a human resources manager for Walmart, Manning and Hopkins decided to give him one final chance to make improvements and avoid termination. [*Id.* at ¶¶ 54–55]. With this final chance, they developed a three-week action plan with specific items that Plaintiff needed to complete and timetables for completing them. [*Id.* at ¶¶ 56, 60]; *see, e.g.,* [Doc. 45-8, pp. 2–3]. If Plaintiff did not fulfill the terms of the plan, then Manning and Hopkins were authorized to move forward with termination. [Doc. 42-3, ¶ 57].

On February 11, 2020, Manning and Hopkins met with Plaintiff to inform him about the three-week plan and to go over its specifics with him: like completing Mods

in a timely manner and "capping" the bins for Department 82 and Department 1. [*Id.* at ¶¶ 58, 63]. Consistent with what Walmart had noted in its three earlier disciplinary warnings, Plaintiff again became very defensive during this meeting and even claimed that both Manning and Hopkins "were jealous of him because of his education." [*Id.* at ¶ 59]; [Doc. 45, Manning Decl., ¶ 27]; [Doc. 46, Hopkins Decl., ¶ 7]. Manning sent Plaintiff an email summarizing what was expected of him over the next three weeks. [Doc. 42-3, ¶ 60]. While Plaintiff claims that he never received Manning's email, he admits in his deposition that Manning and Hopkins shared its contents with him. [*Id.* at ¶ 61]; [Doc. 44, Mathews Depo., p. 44, 171:19—173:23]. In short, Plaintiff "was aware of it." [Doc. 44, Mathews Depo., p. 44, 172:20–21].

From Plaintiff's standpoint, what was required of him in the three-week plan "wouldn't be a problem" because they were things he was used to, already familiar with, and did on a regular basis. [*Id.* at p. 45, 176:17–22]. According to Plaintiff, "[he] satisfied them." [*Id.* at p. 45, 176:22]; [Doc. 42-3, ¶ 64]; [Doc. 53-1, ¶¶ 67A–68A]. However, when Hopkins evaluated Plaintiff's performance each week during the three-week plan, Hopkins saw differently. [Doc. 42-3, ¶¶ 65–66]. According to Hopkins, there were numerous tasks that Plaintiff failed to complete and many were completed incorrectly. [*Id.* at ¶ 66]; [Doc. 46, Hopkins Decl., ¶ 9]. For example, "Plaintiff's Mods were not completed timely and accurately, and he failed to 'cap' his bins consistently" even though bin-related tasks were at the forefront and a heavy focus for each week of

the plan. [*Id.*]; [Doc. 42-3, ¶ 67]; *see, e.g.*, [Doc. 45-8, pp. 2–3]. As a result of Plaintiff's failure to adequately and timely complete the terms of the three-week action plan, Walmart terminated his employment on March 4, 2020, and hired Andre Mills, a black male, to replace him. [Doc. 42-3, ¶¶ 68, 70]. During Hopkins' supervision of Plaintiff—from September 2019 until Plaintiff's termination—Hopkins says that Plaintiff "was the worst performer of all the [d]epartment [m]anagers [he] supervised." [*Id.* at ¶ 69]; [Doc. 46, Hopkins Decl., ¶ 11].

Confident that two black males, Manning and Reeves, harbored personal vendettas against him and wanted him to fail at his job, Plaintiff sued Walmart. [Doc. 42-3, ¶¶ 13, 34]; [Doc. 44-7, p. 2]. Plaintiff believes that they discriminated against him because he's a black man and retaliated against him for speaking out against what he has deemed "unlawful employment practices." [Doc. 44-18, pp. 1–2]. In his charge of discrimination to the Equal Employment Opportunity Commission ("EEOC") filed on August 10, 2020, Plaintiff claims that "[o]n various dates, Manning told [him] that because [he is] a black man with dreadlocks, [he] would have a better chance at a promotion" if he cut his dreadlocks.[9] [Doc. 1-1, p. 1]; *see also* [Doc. 44-18, p. 1]; [Doc. 42-3, ¶¶ 82–83]. Or, as Plaintiff put it in his deposition, Manning apparently told him that

---

[9] Although Plaintiff claims in his charge of discrimination that Manning said this to him "[o]n various dates," his deposition testimony clarifies that Manning "mentioned it in 2019" and then once more "before [Plaintiff was] terminated" on March 4, 2020. [Doc. 44, Mathews Depo., p. 31, 119:12–24]; [Doc. 44-18, p. 1]; [Doc. 43-2, ¶ 68].

his "degrees mean nothing to him" and that "because [Plaintiff was] a black man, [Plaintiff is] going to cut [his] dreadlocks before [he] come[s] up in this company." [Doc. 44, Mathews Depo., p. 50, 197:8–11].

When it comes to summary judgment, the Court is required to believe Plaintiff's evidence and draw all justifiable inferences in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the [nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor."). Thus, the fact that Walmart denies that Manning ever made a comment about Plaintiff's skin color or hairstyle doesn't matter when it comes to ruling on this motion. *See id.*; [Doc. 42-1, p. 8]. However, even taking Manning's comment "at face value," it cannot be overlooked that Manning recommended a black man who wore dreadlocks, Willie Holloway, to co-manage a nearby Walmart location on a temporary basis. [Doc. 42-1, p. 8]; [Doc. 42-3, ¶¶ 78–81]. Ultimately, after co-managing that Walmart store, this same black man—with dreadlocks—got promoted as a store manager for another location. [Doc. 42-3, ¶¶ 80–81]. Then, at one point in his deposition, Plaintiff testified that Reeves told him: "[Y]ou're a black man[,] it's going to be hard for you to . . . come up in this company." [Doc. 44, Mathews Depo., p. 50, 196:8–13]; [Doc. 42-3, ¶ 84]. Other than those two things, Plaintiff admits that nobody else made any other race- or gender-based comments to him—"[o]nly . . . Manning and . . . Reeves." [Doc. 44, Mathews Depo., p. 54, 210:15—211:6]; [Doc. 42-3, ¶ 85].

Now, let's take a look at who the comparators are going to be for this case. First, there's Aurora Patterson, the woman who received the promotion to the human resources position in the summer of 2019. [Doc. 42-3, ¶¶ 6, 72–73]. Remember, that was the promotion Plaintiff wanted to apply for but couldn't because of his disciplinary warnings. [*Id.*]. Second, there's Virginia Almanza, a white female, who also worked as a department manager at the same store as Plaintiff. [*Id.* at ¶ 75]. With respect to these two women, "[a]ll [Plaintiff] is saying is that [he] was overlooked" for his "excellent management" while they "were both brought up above [him]" and "[g]iven better positions and advances" despite what he characterizes as their "atrocious and terrible" performance. [Doc. 44, Mathews Depo., pp. 54–55, 211:14—215:24]; [Doc. 42-3, ¶ 87].

Notwithstanding the fact that no employee under an orange or red disciplinary warning where Plaintiff worked was allowed to apply for *any* open position, Plaintiff argues that Title VII's protections entitle him to damages for lost wages and pain and suffering. [Doc. 42-3, ¶ 90]; [Doc. 1, p. 6]. For the most part, his race discrimination claims can be summed up to Manning and Reeves' comments about him being a "black man," and his gender discrimination claims center around the two women who were given the opportunity to oversee his departments. [Doc. 44, Mathews Depo., p. 55, 211:14—212:2]; [Doc. 42-3, ¶¶ 75, 84–86, 90]. Arguing that all of Plaintiff's claims fail as a matter of law, Walmart disagrees that Title VII affords him any relief, and it moved for summary judgment. *See generally* [Doc. 42-1].

## LEGAL STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A factual dispute is not genuine unless, based on the evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *Four Parcels*, 941 F.2d at 1437); *see also Anderson*, 477 U.S. at 248. "The moving party bears the initial responsibility of informing the court of the basis for its motion." *Four Parcels*, 941 F.2d at 1437. The movant may cite to particular parts of materials in the record, including, "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); Fed. R. Civ. P. 56(c)(1)(A).[10] "When the nonmoving party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material negating the opponent's claim[]' in order to discharge this 'initial responsibility.'" *Four Parcels*, 941 F.2d at 1437–38 (quoting *Celotex*, 477 U.S. at 323). Rather, "the moving party simply may show—that is, point out to the district court—

---

[10] Courts may consider all materials in the record, not just those cited by the parties. Fed. R. Civ. P. 56(c)(3).

that there is an absence of evidence to support the nonmoving party's case." *Four Parcels*, 941 F.2d at 1437–38 (quoting *Celotex*, 477 U.S. at 324) (cleaned up). Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.*

If this initial burden is satisfied, the burden then shifts to the nonmoving party, who must rebut the movant's showing "by producing . . . relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324). The nonmoving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable or[] is not significantly probative' of a disputed fact." *Josendis*, 662 F.3d at 1315 (quoting *Anderson*, 477 U.S. at 249–50). "A mere scintilla of evidence supporting the [nonmoving] party's position will not suffice." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

Further, where a party fails to address another party's assertion of fact as required by Rule 56(c), the Court may consider the fact undisputed for purposes of the motion. Fed. R. Civ. P. 56(e)(2). However, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. *Anderson*, 477 U.S. at 255. Succinctly put,

> [s]ummary judgment is not a time for fact-finding; that task is reserved for trial. Rather, on summary judgment, the district court must accept as fact all allegations the [nonmoving] party makes, provided they are sufficiently supported by evidence of record. So[,] when competing narratives emerge on key events, courts are not at liberty to pick which side they think is more credible. Indeed, if "the only issue is one of credibility," the issue is factual,

and a court cannot grant summary judgment.

*Sconiers v. Lockhart*, 946 F.3d 1256, 1263 (11th Cir. 2020) (internal citations omitted). Stated differently, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "The evidence of the [nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. And "if a reasonable jury could make more than one inference from the facts, and one of those permissible inferences creates a genuine issue of material fact, a court cannot grant summary judgment"; it "must hold a trial to get to the bottom of the matter." *Sconiers*, 946 F.3d at 1263.

## DISCUSSION

Plaintiff's Complaint is by no means a model of clarity. So, to ensure that it covered all possible claims on summary judgment, Walmart sets out Plaintiff's claims as ones for wrongful termination, unlawful discipline, denial of promotional opportunities, and harassment all stemming from race and gender discrimination. [Doc. 42-1, p. 7].

### A.    Plaintiff's Discrimination Claims

In short, Plaintiff believes that Manning and Reeves used his race and gender to embark on a retaliatory scheme that ultimately ended his employment with Walmart. [*Id.*]. Guidance to answers for the many issues presented by Plaintiff's case can be found

in *Tynes v. Florida Department of Juvenile Justice*, 88 F.4th 939 (11th Cir. 2023). As a pro se discrimination case, *Tynes* provides an excellent path forward of why the potentially confusing but "clearly . . . dominant framework" under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), is not always the cleanest or most cut-and-dry approach to decide these types of frequently tangled and factually intense cases. *Tynes*, 88 F.4th at 949 (Newsom, J., concurring).

When it comes to discrimination, an employee can use several theories, ways, methods, routes—whatever word you want to use—to survive a motion for summary judgment. *See Jenkins v. Nell*, 26 F.4th 1243, 1249 (11th Cir. 2022). Broadly speaking, these include proof through direct evidence, circumstantial evidence, statistical proof, or a combination of all three.[11] *Id.* If the employee has and chooses to prove discrimination through direct evidence, then those types of rare cases have their own little set of "tools" for determining what happens next. If, on the other hand, the employee has only circumstantial evidence to prove discrimination, then those cases operate with a separate set of "tools." Branching from underneath the circumstantial-evidence route rests proof of discrimination through either a burden-shifting tool or through construction of what's known as a "convincing mosaic." *See McDonnell Douglas*, 411 U.S. at 802; *Smith v. Lockheed-Martin Corp.* 644 F.3d 1321, 1328 (11th Cir. 2011). And then,

---

[11] An employee can also establish a prima facie case of discrimination by demonstrating a pattern of discrimination through statistics. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990). However, the parties do not rely on any data or discuss Plaintiff's claims under this method.

stemming from the burden-shifting tool and the convincing mosaic, they each have their own set of factors that must be considered in determining whether a case proceeds to trial. *See McDonnell Douglas*, 411 U.S. at 802; *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) ("*Lewis II*").

Yes, all of that seems like a lot, and it is. Employment discrimination cases are far from unique in the fact that they, like countless others, start with a statute that has been subject to judicial interpretation for now more than half a century. *Tynes*, 88 F.4th at 950 (Newsom, J., concurring). District courts are intimately familiar with how the methods to prove employment discrimination have been parsed, refined, or even warped over the decades. Despite what seems like a busy crossroads to prove employment discrimination, each path converges to one ultimate question. It's really simple: "Does the summary-judgment record reveal a genuine dispute of material fact about whether an employer discriminated against its employee 'because of' a protected characteristic?" *Id.* at 954 (Newsom, J., concurring).

### 1.    <u>Title VII's Time Bar</u>

Before getting to that ultimate question, the Court notes that some of the things Plaintiff relies upon to support his discrimination claims are time barred. Suing under Title VII requires an aggrieved employee to first exhaust the federal administrative remedies by filing a charge of discrimination with the EEOC. *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1317 (11th Cir. 2001). Plaintiff has done so in this case. *See, e.g.*, [Doc. 1-2].

In Georgia, however, because it is a non-deferral state,[12] only those claims arising within 180 days of the filing of a charge are actionable under Title VII. *E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1271 (11th Cir. 2002) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114–15 (2002)). What does that mean for Plaintiff? It means that a few of his allegations can't be used to support his discrimination claims. Plaintiff filed is charge of discrimination with the EEOC on August 10, 2020; thus, anything that occurred 180 days prior—before February 12, 2020—is time barred. [Doc. 42-3, ¶ 82]; *see, e.g.*, [Doc. 44-18, p. 1].

For example, Plaintiff frequently talks about Reeves allegedly "target[ing]" him, retaliating against him, and wrongfully terminating him "in 2016" in violation of Walmart's policies. [Doc. 53-2, pp. 1, 3–4, 15]. Also, Plaintiff uses the reason why he couldn't apply for the human resources position "[b]ack in 2019" as a basis for holding Walmart liable under Title VII. [*Id.* at p. 17]; [Doc. 42-3, ¶¶ 4–6, 72–73]; [Doc. 44-7, p. 2]; [Doc. 44, Mathews Depo., pp. 30–31, 117:17—119:1]. Those are out. With February 12, 2020, in mind, let's see what evidence can be considered in answering that ultimate

---

[12] "Non-deferral states" are those states without any laws banning various types of discrimination in the workplace and without a state entity authorized to grant or to seek relief for victims of such discrimination. *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1100 n.20 (11th Cir. 1996); *Wilkerson*, 270 F.3d at 1317 (discussing that for a charge regarding discrimination under Title VII "to be timely in a non-deferral state such as Georgia, it must be filed within 180 days of the last discriminatory act[]"); *Sheffield v. United Parcel Serv., Inc.*, 403 F. App'x. 452, 454 n.2 (11th Cir. 2010) (quoting *Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1214 n.2 (11th Cir. 2001)) (recognizing that "Georgia is a non-deferral state because it is without 'laws banning age discrimination in employment and without state entities authorized to grant or seek relief for victims of age discrimination[]'").

question for Plaintiff's discrimination claims.

2.    **Direct Evidence**

Walmart kicks off its summary-judgment arguments by discussing whether

Manning and Reeves' alleged comments about Plaintiff being a "black man" and a

"black man with dreadlocks" constitutes direct evidence of race or gender

discrimination. [Doc. 42-3, ¶¶ 83–84]; [Doc. 42-1, pp. 7–8]. Cases in which employees

prove discrimination through direct evidence are increasingly rare, but that doesn't

mean they don't exist. *Tynes*, 88 F.4th at 950 (citing *Fernandez v. Trees, Inc.*, 961 F.3d 1148,

1156 (11th Cir. 2020)). "Direct evidence of discrimination is evidence that 'reflects a

discriminatory . . . attitude correlating to the discrimination . . . complained of by the

employee' and, 'if believed, proves the existence of a fact without inference or

presumption.'" *Fernandez*, 961 F.3d at 1156 (quoting *Wilson v. B/E Aerospace, Inc.*, 376

F.3d 1079, 1086 (11th Cir. 2004)). In the Eleventh Circuit, direct-evidence cases are

reserved for "[o]nly the most blatant remarks, whose intent could mean nothing other

than to discriminate on the basis of some impermissible factor[.]" *Id.*; *Tynes*, 88 F.4th at

950 (citing *Fernandez*, 961 F.3d at 1156). If discriminatory motive is merely just

suggested by the statement, the statement is not direct evidence, it is circumstantial.

*Fernandez*, 961 F.3d at 1156 (quoting *Wilson*, 376 F.3d at 1086).

Plaintiff testified that Manning's exact words were this: "He said my degrees

mean nothing to him, and that I'm a black man with dreadlocks, and for me to get

promoted in this company I would have to cut my dreadlocks, because I'm a black man[.]" [Doc. 44, Mathews Depo., p. 31, 119:12–16]. As noted above, Plaintiff confirmed in his deposition that Manning said this to him in 2019 and "said it again" "before [Plaintiff] got terminated." [*Id.* at p. 31, 119:23–24]; n.9, *supra*. What Plaintiff says Manning told him—while probably less than ideal for any workplace—doesn't constitute direct evidence of race or gender discrimination because there simply isn't enough to show that Manning made his comments with "nothing other than [the intent] to discriminate." *Fernandez*, 961 F.3d at 1156 (quoting *Wilson*, 376 F.3d at 1086).

Why? Because Manning recommended another black man who wore dreadlocks for a management opportunity. [Doc. 43-2, ¶¶ 78–81]. Such a recommendation means that discriminatory motive is merely suggested by Manning's supposed comments, and "[i]f the alleged statement suggests, but does not prove, a discriminatory motive," it is not direct evidence. *Fernandez*, 961 F.3d at 1156 (quoting *Wilson*, 367 F.3d at 1086). A recommendation of one black man with dreadlocks but not another requires an "inferential leap in order . . . to find discrimination." *Bass v. Bd. of Cnty. Comm'rs, Orange Cnty.*, 242 F.3d 996, 1010 (11th Cir. 2001), *overruled in part on other grounds by Crawford v. Carroll*, 529 F.3d 961 (11th Cir. 2008). His alleged comments don't "reflect[] a discriminatory . . . attitude correlating to the discrimination . . . complained of by [Plaintiff]," and they, therefore, cannot be considered direct evidence. *Fernandez*, 961 F.3d at 1156 (quoting *Wilson*, 376 F.3d at 1086); [Doc. 45, Manning Decl., ¶¶ 35–36].

Next, with respect to Reeves' alleged comment that it was "going to be hard" for Plaintiff to "come up" in the company because Plaintiff is a "black man"—that one's a little tougher. [Doc. 42-3, ¶ 84]; [Doc. 44, Mathews Depo., p. 50, 196:8–13]. To be clear, Plaintiff admitted in his deposition that what Reeves allegedly said "wasn't to the nature of what . . . Manning [allegedly] said." [Doc. 44, Mathews Depo., p. 50, 196:25—197:3]. But, regardless of whether Plaintiff saw one alleged comment as worse than the other, the Eleventh Circuit has several cases that discuss examples of direct evidence of discrimination. *See Miller v. Dillard Paper Co.*, 120 F.3d 1181, 1189–90 (11th Cir. 1997) (collecting cases). One of those cases involved a manager who said "[t]hose [black employees] out there will not get anywhere in this company." *Id.* at 1190 (citing *E.E.O.C. v. Beverage Canners, Inc.*, 897 F.2d 1067, 1068 n.3 (11th Cir. 1990)). The Eleventh Circuit saw that as direct evidence. Now, to be perfectly candid, the statement from *Beverage Canners* included "flagrant, revolting, and inflammatory" racial slurs that Reeves didn't use, but to say that his comment isn't nearly identical to the one from *Beverage Canners* may be a stretch too far. 897 F.2d at 1068, 1068 n.3.

In *Sennello v. Reserve Life Insurance Co.*, the Eleventh Circuit held that "we can't have women in management" was a statement that also constituted direct evidence. 872 F.2d 393, 394–95 (11th Cir. 1989). Sure, that statement concerns gender—for which Title VII also provides protection, 42 U.S.C. § 2000e-2(a)(1)—but replace the word "women" with "black people" and you have the statement: "[W]e can't have [black people] in

management." Again, there's a razor-thin difference between that and it "[being] hard for [Plaintiff] to . . . come up in this company" because Plaintiff is a "black man." [Doc. 42-3, ¶ 84]; [Doc. 44, Mathews Depo., p. 50, 196:8–13].

Walmart tries to sidestep the likely hurdle thrust into this case because of Reeves' alleged comment by arguing that "it seems ludicrous to suggest that two black managers intended to discriminate against Plaintiff because he is a black man." [Doc. 42-1, p. 8]. The Eleventh Circuit, however, has already and quite clearly held that such an argument is "totally without merit." *Billingsley v. Jefferson Cnty.*, 953 F.2d 1351, 1353 (11th Cir. 1992); [Doc. 42-1, p. 8]. Walmart offered this argument with no legal citation which makes sense . . . because it's not the law—just an argument it hoped the Court would buy. *See* [Doc. 42-1, p. 8]. "Title VII 'makes it an unfair employment practice for an employer to discriminate against any individual with respect to hiring or the terms and conditions of employment because of such individual's race, color, religion, [gender], or national origin[.]'" *Mann v. Se. Railcar, Inc.*, No. 1:17-CV-176 (WLS), 2020 WL 12655490, at *6 (M.D. Ga. Feb. 28, 2020) (quoting *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 645 (1989)). Thus, "[t]he presence of a black man in a supervisory or decision-making position . . . cannot shield [an employer] from liability under Title VII" in the face of complaints made by a black employee. *Billingsley*, 953 F.2d at 1353. In other words, just because there may be same-race discrimination, the liability slate isn't automatically wiped clean under Title VII. *See United States v. Crosby*, 59 F.3d 1133, 1135

n.4 (11th Cir. 1995) (citing *Billingsley*, 953 F.2d at 1353). Employment discrimination

doesn't vanish when "a supervisor . . . is of the same race as the alleged victim[.]" *Id.*

But, where a supervisor and employee are the same race, the employee should present

evidence that the supervisor "held members of his race to a higher standard of conduct

than members of another race." *Mann*, 2020 WL 12655490, at *6 (quoting *Crosby*, 59 F.3d

at 1135 n.4). A discussion on that, however, is better reserved for the analysis that's just

around the corner.

For now, the Court only taps into whether Manning or Reeves' alleged

comments constitute direct evidence of race and gender discrimination. As for

Manning, no. As for Reeves, however, more is to be said with respect to his comment

that "it's going to be hard for [Plaintiff] to . . . come up in this company" because

Plaintiff is a "black man." [Doc. 44, Mathews Depo., p. 50, 196:8–13]; [Doc. 42-3, ¶ 84].

Sure, Reeves may not have tossed in racial slurs like some of the comments and

statements previously discussed by the Eleventh Circuit, *see, e.g.*, *Miller*, 120 F.3d at

1189–90, but Walmart never explained what Reeves could have meant. All Walmart

said was "whatever these comments might mean, they are not direct evidence of

discrimination." [Doc. 42-1, p. 8]. Reeves didn't say that it would be hard for Plaintiff to

move up in the company because he thought Plaintiff possessed a poor work ethic and

attitude. He allegedly said, "it's going to be hard for [Plaintiff] to . . . come up in this

company" because Plaintiff is a "*black man*." [Doc. 44, Mathews Depo., p. 50, 196:8–13

(emphasis added)]; [Doc. 42-3, ¶ 84 (emphasis added)].

Let's assume, for now, that what Reeves allegedly said could constitute direct evidence. Even under this assumption, Plaintiff can't rely on it to support his discrimination claims because it's outside the relevant timeframe. Let's examine why. For starters, the record is exceedingly muddy as to when "on several occasions" Reeves allegedly said this to Plaintiff. Reeves, however, only supervised Plaintiff from "early 2019" until Hopkins "began supervising [him]" "[i]n September . . . 2019." [Doc. 43-2, ¶¶ 34, 50, 84]. At that point, Reeves sort of just trickles off from any involvement with Plaintiff. When you look closely, though, it's clear from September 2019 until Plaintiff was terminated on March 4, 2020, that Manning and Hopkins oversaw Plaintiff's performance and whether he remained employed at Walmart—not Reeves. [Doc. 43-2, ¶¶ 50–68]. The last thing Reeves did to Plaintiff was issue him his red disciplinary warning on June 29, 2019, and discuss it with him and Manning. [*Id.* at ¶¶ 43, 48]. Therefore, the only relevant time during which Reeves could've stated his alleged comment to Plaintiff for it to have actually mattered—as one of Plaintiff's supervisors and a possible decision-maker for his employment—was from early- to mid-2019. *Joe's Stone Crabs*, 296 F.3d at 1271. But as they say: Timing is everything.

Discrete discriminatory acts such as "termination, *failure to promote*, denial of transfer, or refusal to hire are [all] easy to identify" and if "untimely filed" are "no longer actionable." *Nat'l R.R. Passenger Corp.*, 536 U.S. at 114–15 (emphasis added); [Doc.

42-1, p. 16]. No matter the evidentiary label for Reeves' alleged comment, it is time barred and simply not actionable with respect to claims regarding Plaintiff's lack of promotion or termination. *Nat'l R.R. Passenger Corp.*, 536 U.S. at 114–15. Had what Reeves' allegedly said fell within the actionable 180-day period, the Court's analysis on it "[being] hard for [Plaintiff] to . . . come up in this company" because Plaintiff is a "black man" would have been very different. [Doc. 42-3, ¶ 84]; [Doc. 44, Mathews Depo., p. 50, 196:8–13]. In fact, had it been actionable, the very existence of that alleged comment on top of Walmart's understanding that "Plaintiff's testimony [about it had to be taken] as true," might have made impaneling a jury the Court's next step. [Doc. 42-3, ¶ 84]; [Doc. 42-1, p. 8]; Fed. R. Civ. P. 56(c)(1)(A).

Where the evidence for an employee's discrimination case consists of alleged direct evidence that a supervisor acted with a discriminatory motivation, the ultimate issue of discrimination is proved *if the trier of fact* believes that evidence. *Lee v. Russell Cnty. Bd. of Educ.*, 684 F.2d 769, 774 (11th Cir. 1982); *Tompkins v. Morris Brown Coll.*, 752 F.2d 558, 563 (11th Cir. 1985). If believed by the trier of fact, the employer cannot debunk or "rebut this type of showing of discrimination simply by articulating or producing evidence of legitimate, nondiscriminatory reasons" as it could under

*McDonnell Douglas.*[13] *Lee*, 684 F.2d at 774; *Tompkins*, 752 F.2d at 563. Instead, *Jones v. Gerwens* says that the employer has the burden of "convinc[ing] *the trier of fact* that it is more likely than not that the decision would have been the same absent consideration of the illegitimate factor." 874 F.2d at 1539 n.8. But *Tompkins*, on the other hand, plainly says, "When direct evidence of discrimination has been introduced, *the lower court must*, as an initial matter, specifically state whether or not it believes the [employee's] proffered direct evidence of discrimination." 752 F.2d at 563–64 (emphasis added). For a lower court to be able to place its thumb on the scale, though, and "state whether or not it believes [an employee's] proffered direct evidence," seems to butt heads with very sound summary-judgment principles. *Id.* After all, courts "must accept as fact all allegations the [nonmoving] party makes, provided they are sufficiently supported by evidence of record," and they "are not at liberty to pick which side they think is more credible." *Sconiers*, 946 F.3d at 1263 (internal citations omitted); *Anderson*, 477 U.S. at 249 (holding that "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial[]").

On the rare occasion that direct evidence exists at summary judgment, what

---

[13] "Where a case of discrimination is proved by direct evidence, [an employer] bears a heavier burden," and the burden-shifting scheme presented by *McDonnell Douglas* has no place in a direct-evidence analysis. *Lee*, 684 F.2d at 774; *Ramirez v. Sloss*, 615 F.2d 163, 168 (5th Cir. 1980) ("In the rare situation in which the evidence establishes that an employer openly discriminates against an individual[,] it is not necessary to apply the mechanical formula of *McDonnell Douglas* to establish an inference of intentional discrimination; the showing has already been made directly."). In fact, if direct evidence is present, "it is incorrect to rely on a *McDonnell Douglas* form of rebuttal." *Lee*, 684 F.2d at 774.

happens to or becomes of employment discrimination cases filed in the Eleventh Circuit seems a tad bit flummoxed. But, of course, only the Eleventh Circuit can reconcile these (in this Court's humble opinion) contradictory holdings in its precedent. Here, the Court need not wade into this particular thicket because Manning's alleged comment does not constitute direct evidence of discrimination under Eleventh Circuit precedent. *Fernandez*, 961 F.3d at 1156. And, as for Reeves, even if he said his comment as one of Plaintiff's supervisors from "early 2019" until September 2019, that occurred before February 12, 2020, so it's not actionable to support a failure-to-promote or a wrongful termination claim.[14] *Nat'l R.R. Passenger Corp.*, 536 U.S. at 114–15; [Doc. 42-3, ¶¶ 34, 50]. Still though, it's only halftime.

---

[14] Harassment claims, though, are different and not necessarily subject to such a stringent time bar. *Nat'l R.R. Passenger Corp.*, 536 U.S. at 115–16. Nevertheless, to the extent Plaintiff asserts a claim for harassment in the workplace based his race and gender because of Manning and Reeves' alleged comments, it fails. Other than what Manning and Reeves allegedly said to Plaintiff, no one else ever said anything to him regarding his race or gender. [Doc. 42-3, ¶ 84]. Obviously, Plaintiff can prove that he belongs to a protected group, that what Manning and Reeves allegedly said to him was unwelcome, and that it implicated his race and gender. *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1231 (11th Cir. 2006). Regardless of whether their alleged comments were "sufficiently server or pervasive"—let's assume they were—Plaintiff still cannot establish that "the harassment culminated in a 'tangible employment action' against [him]." *Id.* (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 753–54 (1998)). "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* Although Plaintiff was ineligible to apply for promotions and was eventually terminated from his employment with Walmart, there isn't a causal link between those employment decisions and what Manning and Reeves allegedly said to him. *Id.* (citing *Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1312 (11th Cir. 2001)). Plaintiff certainly has adverse employment actions, but he can't show that they're "causally related to the incident of harassment." *See id.* at 1232. As discussed at length below, the evidence in this case clearly shows that other, perfectly legal and legitimate factors were in play when it came to Plaintiff's employment at Walmart—factors completely removed from and having nothing to do with his race or gender.

### 3.    Circumstantial Evidence

Although Plaintiff can't rely on direct evidence to survive summary judgment, the circumstantial-evidence route is still available as potential recourse. *See Jenkins*, 26 F.4th at 1249. When an employee uses circumstantial evidence to support his claims, generally, as briefly mentioned above, courts apply the burden-shifting tool—the framework that comes from *McDonnell Douglas.* 411 U.S. at 802. Of course, that framework is by no means exclusive, and hopefully it's one that's fading and being "relegate[d] . . . to the sidelines." *Jenkins*, 26 F.4th at 1249–51; *Tynes*, 88 F.4th at 944; *Lee*, 684 F.2d at 773; *see also Tynes*, 88 F.4th at 958 (Newsom, J., concurring). For now, though, the parties have relied on it for Plaintiff's case, so the Court will undertake the analysis as well.

### a.    McDonnell Douglas *Framework*

Okay, step one. The initial burden of the framework belongs to the employee who says he's been discriminated against by satisfying four-part test. *Tynes*, 88 F.4th at 944. The employee can establish a prima facie case[15] of discrimination when he shows that he (1) "belongs to a protected class," that he (2) "was subjected to an adverse employment action," that he "was qualified to perform the job in question," and that (4)

---

[15] "'Prima facie case' has a specialized meaning in this context that goes beyond simply producing sufficient evidence to create a jury question; rather, this prima facie case creates a rebuttable presumption of discrimination . . . ." *Lee*, 684 F.2d at 773 (citing *Tex. Dep't of Comm. Affs. v. Burdine*, 450 U.S. 248, 254 n.7 (1981)); *see also Tynes*, 88 F.4th at 944 (citing *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714–15 (1983) ("The prima facie showing entitles the [employee] to a rebuttable presumption of intentional discrimination.")).

his "employer treated 'similarly situated' employees outside of [his] protected class more favorably." *McDonnell Douglas*, 411 U.S. at 802; *Lewis v. City of Union City*, 918 F.3d 1213, 1220–21 (11th Cir. 2019) (en banc) ("*Lewis I*"). The fourth requirement is met when the employee "present[s] evidence of a comparator—someone who is 'similarly situated in all material respects.'" *Jenkins*, 26 F.4th at 1249 (quoting *Lewis I*, 918 F.3d at 1224). The burden shifts if the employee succeeds in making out a prima facie case, and you move onto step two. *Lewis I*, 918 F.3d at 1221 (citing *Burdine*, 450 U.S. at 253). Step two belongs to the employer. The employer must articulate a legitimate, nondiscriminatory reason for its actions. *Id*. Should the employer carry its burden, then the burden reverts to the employee for step three. *Id.* Step three requires the employee to "demonstrate that the [employer's] proffered reason was merely a pretext for unlawful discrimination[.]" *Id.*

Not to spoil the outcome, but Plaintiff cannot establish a prima facie case. Yes, he belongs to a protected class and suffered adverse employment actions by way of not being given any more promotional opportunities and by Walmart terminating his employment, but he cannot show that he "was qualified to perform the job[s] in question." *Lewis I*, 918 F.3d at 1220–21.

In the failure-to-promote arena, Plaintiff had active disciplinary warnings that, for a 12-month period, prevented him from obtaining any sort of promotion at Walmart. [Doc. 43-2, ¶¶ 4–6, 35, 43]. Disciplinary warnings that his proffered comparators didn't have. [*Id.* at ¶¶ 73, 75, 90]; *see Lewis I*, 918 F.3d at 1227 (noting that

valid comparators will "[o]rdinarily . . . share the [employee's] . . . disciplinary history" and that "'[d]ifferences in disciplinary history' can disqualify a[n] [employee's] proffered comparators"). Then, as to Plaintiff's termination, despite the fact that Walmart gave him "one final chance to improve his performance," he failed to follow through with the three-week plan that Walmart set out for him. [*Id.* at ¶¶ 55, 68]. Suppose, though, for argument's sake—notwithstanding the fact that Plaintiff wasn't qualified, that his comparators weren't similarly situated in all material respects, and that Walmart replaced him with someone in his same protected class—that he was able to establish all four elements of his prima facie case. [Doc. 42-3, ¶¶ 35, 43, 68, 70]; *Jenkins*, 26 F.4th at 1249 (quoting *Lewis I*, 918 F.3d at 1224). Even operating under these supposed (and very generous) facts, *McDonell Douglas*'s burden-shifting framework still doesn't push Plaintiff's discrimination claims through to trial.

For step two, Walmart's burden of production when it comes to articulating some legitimate nondiscriminatory reason, is "exceedingly light." *Lewis I*, 918 F.3d at 1221 (citing *Burdine*, 450 U.S. at 253); *Smith v. Horner*, 839 F.2d 1530, 1537 (11th Cir. 1988). With respect to its reasons why Plaintiff wasn't eligible for any promotions and why it ultimately had to terminate his employment, Walmart has more than satisfied this burden. Having done what is "required of [it]" under the second step of the framework, "whether [Plaintiff] really" established a prima facie case "is *no longer relevant*." *Tynes*, 88 F.4th at 945 (quoting *Aikens*, 460 U.S. at 715). Since Walmart clearly

articulated its many nondiscriminatory reasons for its employment decisions and actions, the inference of discrimination put in place by Plaintiff's supposed "establishment" of a prima facie case "drops," and "the factual inquiry proceeds to a new level of specificity." *Burdine*, 450 U.S. at 255 & n.10; *Tynes*, 88 F.4th at 944–45.

At step three, Plaintiff must try and show "not only that [Walmart's] justification was pretextual, but that the real reason for the employment action was discrimination." *Tynes*, 88 F.4th at 944 (citations omitted). This final piece of the *McDonnell Douglas* framework "merges with [Plaintiff's] ultimate burden of persuading the factfinder that [he] has been the victim of intentional discrimination." *Id.* See how easy it is to get distracted from that one ultimate question in employment discrimination cases? Let's refresh: "Does the summary-judgment record reveal a genuine dispute of material fact about whether an employer discriminated against its employee 'because of' a protected characteristic?" *Id.* at 954 (Newsom, J., concurring).

Pretext can be demonstrated "by revealing such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1348 (11th Cir. 2007) (quotation omitted) (alteration adopted). On top of that, "[a] plaintiff cannot prove pretext by simply arguing or even by showing that [he] was better qualified than the individual who received the promotion[]" or didn't get fired. *Brooks v. Cnty. Comm'n*

*of Jefferson Cnty.*, 446 F.3d 1160, 1163 (11th Cir. 2006).

If Plaintiff could deliver a keynote speech about his case, it would center all around his belief that Walmart is just simply lying about everything. He says that his disciplinary write-ups were all "made [on] false statements," amounting to nothing more than "blatant[ ] harass[ment] . . . with malice intent to cause harm" and torpedo his "career at Walmart." [Doc. 53-2, p. 4]. To support this, Plaintiff filed pages and pages of documents detailing his complaints about Manning, how Manning's "claims [were] false," and how he felt "target[ed]" by Manning.[16] *See, e.g.*, [Doc. 2-2]; [Doc. 54-1]. Some of these documents came in the form supporting "[w]itness [s]tatement[s]" from a handful of co-workers and some of Plaintiff's regular customers. *See, e.g.*, [Doc. 16-1]; [Doc. 16-2]; [Doc. 20]. For example, one individual provided a statement on Plaintiff's behalf "to confirm" that Manning "used his assistant[] [managers] to make false allegations about poor performance in order to provide a reason for terminating [Plaintiff]." [Doc. 2-2, p. 2]; [Doc. 54-1, p. 11]. It's obvious that these statements purport

---

[16] Walmart argues that "when the same actor is involved in decisions to hire and to terminate, there is a permissible inference that there was no discriminatory animus." [Doc. 42-1, p. 12 (quoting *Williams v. Vitro Servs. Corp.*, 144 F.3d 1438, 1443 (11th Cir. 1998))]. However, the facts of this case don't paint that picture. Walmart states that "Plaintiff was hired . . . on October 3, 2016." [Doc. 43-2, ¶ 11]. Walmart doesn't say *who* hired Plaintiff, only that he "was hired." [*Id.*]. Passive voice can be a doozy. No matter, though, without more information, it seems that it couldn't have been Manning who hired Plaintiff because Manning didn't work at the same store as Plaintiff until May 2018, and Hopkins didn't become Plaintiff's supervisor until September 2019. [*Id.* at ¶¶ 13, 50]. So, Walmart's point about a lack of animus when "the hirer and firer are the same actor," doesn't cut it. *Williams*, 144 F.3d at 1442–43. But, yes, to the extent *Williams* can be stretched to cover Manning because he once promoted Plaintiff to a managerial position, the Court agrees that there is "a permissible inference that no discriminatory animus motivated [Manning's] actions" when it comes to Plaintiff's failure-to-promote and wrongful termination claims. *Id.* at 1443; [Doc. 42-1, p. 12]; [Doc. 43-2, ¶ 16].

to be either affidavits or declarations, but they're made without the all-important jurat language and shouldn't be considered for summary-judgment purposes.[17] Not only that, but these individuals' subjective and conclusory beliefs are insufficient save Plaintiff's claims. *Carter v. Miami*, 870 F.2d 578, 585 (11th Cir. 1989) (holding that conclusory allegations based on mere subjective beliefs do not create a genuine issue of material fact); *see also* [Doc. 57, pp. 6–8]. Even if the Court could consider these statements at summary judgment, it must be remembered that "an employer can generally fire or discipline an employee for 'a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all,' so long as that action 'is not for a discriminatory reason." *Tynes*, 88 F.4th at 944 (quoting *Flowers v. Troup Cnty. Sch. Dist.*, 803 F.3d 1327, 1338 (11th Cir. 2015)).

Through and through, it's beyond clear that Plaintiff disagrees with how Manning and everyone else at Walmart characterized his job performance. Plaintiff even submitted photos of what he claims are his organized and tidy bins to establish that he didn't have poor job performance. [Doc. 53-2, p. 4]; [Doc. 53-1, ¶¶ 87A–89A]; *see, e.g.*, [Doc. 54-1, pp. 2–3, 5, 7]. Walmart, however, says that he did, and the Court doesn't sit as a super-personnel department with the ability to second-guess Walmart's business

---

[17] Whether it be an affidavit or a declaration, there *must* be language solidifying that statements made were made "under the penalty of perjury." *See Roy v. Ivy*, 53 F.4th 1338, 1350 (11th Cir. 2022) (citing *Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1305–06 (5th Cir. 1988)) (discussing requirements of affidavits and declarations and holding that a district court correctly refused to consider a filing that "did not include any 'penalty of perjury' language").

decisions on the issues of Plaintiff's job performance, his promotion ineligibility, or his termination. *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010). Indeed, why an employer did something is irrelevant, and courts are only concerned with whether employers are able to give honest explanations for their decisions or actions and whether they were made with a discriminatory motive. *Id.*; *Elrod v. Sears, Roebuck and Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991). Walmart gave its honest explanations about Plaintiff's job performance—plain and simple. In the Eleventh Circuit, moreover, "[t]he inquiry into pretext centers upon the employer's beliefs, not the employee's" own perceptions of his performance. *Alvarez*, 610 F.3d at 1266. "Thus, where the employer produces performance reviews and other documentary evidence of misconduct and insubordination that demonstrate poor performance, an employee's assertions of his own good performance are insufficient to defeat summary judgment, in the absence of other [admissible] evidence." *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997), *overruled on other grounds by Lewis I*, 918 F.3d at 1220–21.

Walmart produced Plaintiff's yellow, orange, and red disciplinary warnings, as well as what was expected of him for the three-week action plan. *See, e.g.*, [Doc. 45-5]; [Doc. 45-6]; [Doc. 45-7]; [Doc. 45-8]. Square that with just a few (undated?) photos and a list of co-workers' names and their phone numbers, and it's clear that Plaintiff has not come forward with the "other evidence" necessary to demonstrate pretext. *Holifield*, 115 F.3d at 1565; *see, e.g.*, [Doc. 54-11]. Whether Plaintiff was or wasn't a good employee is

not for this Court to referee, and neither is Title VII an avenue for him to litigate his disagreements with Walmart's beliefs about his job performance. *Alvarez*, 610 F.3d at 1266 (citing *Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002)). Had Walmart allowed other employees with an orange or red disciplinary warning to apply for open promotions, then maybe Plaintiff could've demonstrated pretext since "[a]n employer's violation of its own normal hiring procedure may be evidence of pretext." *Bass*, 256 F.3d at 1108. But, here, Walmart didn't do that. [Doc. 42-3, ¶¶ 6–7, 90]. By all accounts, there is nothing in the record to show that Walmart's "proffered legitimate reasons for its actions [are] unworthy of credence," and Plaintiff can't create a triable issue through reliance on the *McDonnell Douglas* framework either. *Springer*, 509 F.3d at 1348; *Tynes*, 88 F.4th at 946. However, one last theory remains—the convincing mosaic. *Jenkins*, 26 F.4th at 1250.

### b.    Convincing Mosaic

Although Walmart doesn't mention the convincing-mosaic theory, that doesn't mean it's automatically off the table as a permissible avenue through which Plaintiff can survive summary judgment. *Id.* at 1250. By that same token, the fact that an employer doesn't discuss it, doesn't necessarily relieve a court of its obligation to consider it. Indeed, to overlook the convincing mosaic as some inferior, lesser-than theory to prove an employment discrimination case dilutes the point of this Court's lengthy discussion of *Tynes* and its agreement with Judge Newsom's nudging signal to shift how these

cases ought to be analyzed in the Eleventh Circuit. 88 F.4th at 949–58 (Newsom, J.,

concurring).

But what is it? What is a "convincing mosaic?" It's a collection of circumstantial

evidence—tiles, if you will—that "is simply enough evidence for a reasonable factfinder

to infer intentional discrimination in an employment action." *Id.* at 946. And, although a

mosaic is a "collection" of tiles, one tile can be enough to permit a reasonable factfinder

to infer discrimination. *Id.* at 955 (Newsom, J., concurring). To assemble a convincing

mosaic, an employee can point to evidence that demonstrates "suspicious timing,

ambiguous statements, or other information from which discriminatory intent may be

inferred." *Jenkins*, 26 F.4th at 1250 (quoting *Lewis II*, 934 F.3d at 1185). An employee can

also point to "systematically better treatment of [similarly-situated] employees." *Id.*

And, of course, there's always the issue of pretext—that the nondiscriminatory excuse

that the employer gave for its decisions and actions is nothing more than a lie to cover

up discrimination. *Id.*

Constructing a convincing mosaic "turns on the existence of a genuine factual

dispute." *Tynes*, 88 F.4th at 955 (Newsom, J., concurring). This theory is the closest we

can get to mirroring the summary-judgment standard detailed above. *Id.* at 956

(Newsom, J., concurring). That said, the Court's imminent decision with respect to

Plaintiff's race- and gender-discrimination claims doesn't turn on whether *it's*

"convinc[ed]"—the decision comes from nothing more than an evidentiary

determination. *Id.* at 956 (Newsom, J., concurring). There isn't a genuine factual dispute in this case that would allow a reasonable jury to find that Walmart discriminated against Plaintiff because he is black or a male. Let's look at that question one last time: "Does the summary-judgment record reveal a genuine dispute of material fact about whether an employer discriminated against its employee 'because of' a protected characteristic?" *Id.* at 954 (Newsom, J., concurring). No, it does not.

Walmart provided exactly when, why, and how Plaintiff delivered an inadequate job performance—documented to a fault. *See, e.g.*, [Doc. 45-5]; [Doc. 45-6]; [Doc. 45-7]; [Doc. 45-8]. There is no evidence whatsoever that another employee received systematically better treatment than Plaintiff. *Jenkins*, 26 F.4th at 1249 (quoting *Lewis I*, 918 F.3d at 1224). There is no evidence that another employee was able to apply for and obtain promotional opportunities while carrying an orange or red disciplinary warning like Plaintiff. [Doc. 43-2, ¶ 90]. There's no evidence that Walmart choose to keep another employee under a red disciplinary warning who continuously failed to meet company standards on its payroll. There *is* evidence, however, that Walmart gave Plaintiff "one final chance to improve his performance" before it decided enough was enough. [*Id.* at ¶ 55]. Tiles consisting of warning after warning and chance after chance simply don't assemble a mosaic that would allow "a reasonable factfinder to infer intentional discrimination." *Tynes*, 88 F.4th at 946; [Doc. 43-2, ¶ 55]. With that, Walmart is entitled to summary judgment on Plaintiff's discrimination claims, leaving only his retaliation

claim for the Court to consider.

###### B.    **Plaintiff's Retaliation Claim**

Employers are prohibited from retaliating against "any . . . employee[] . . .

because he has opposed any practice made an unlawful employment practice" by Title

VII, "or because he has made a charge, testified, assisted, or participated in any manner

in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). The

best way to phase Plaintiff's retaliation claim is exactly as Walmart phrased it. "Plaintiff

claims that he was wrongfully terminated as 'retaliation' for the complaints he made"

about Manning and Reeves. [Doc. 42-1, p. 13]. Like a claim for employment

discrimination, we start with the prima facie case.

Making a prima facie case for retaliation requires an employee to show that he

engaged in statutorily protected activity and suffered an adverse action that was

causally related to the protected activity.[18] *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d

1121, 1134–35 (11th Cir. 2020) (en banc). Once established, the prima facie case "creates

a 'presumption that the adverse action was the product of an intent to retaliate.'" *Id.* at

1135 (quoting *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009)). Then, the burden

shifts the employer "to rebut the presumption [of retaliation] by articulating a

legitimate, [non-retaliatory] reason for the employment action." *Id.* "If the employer

---

[18] An action is materially adverse if it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co v. White*, 548 U.S. 53, 56 (2006).

produces such a reason, the presumption is rebutted, and the [employee] must then demonstrate that the 'proffered reason was merely . . . pretext," masking a retaliatory action. *Id.* Seems familiar enough, right? However, "[t]o establish the necessary causation, [the employee] must demonstrate that "[his] protected activity was a but-for cause of the alleged adverse action by the employer." *Id.* (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013)). Stated differently, an employee "must prove that had [he] not [engaged in the protected conduct], [he] would not have been fired." *Id.* (quoting *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924 (11th Cir. 2018)). Again, as with claims concerning employment discrimination, the ultimate burden of persuasion "throughout this entire process," remains with the employee. *Id.* (quoting *Sims v. MSM, Inc.*, 704 F.3d 1327, 1333 (11th Cir. 2013))

Contemporaneously with his Complaint filed at the outset of this lawsuit, Plaintiff also submitted several emails sent to human resources in which he complained of being "treated unfairly and truly hindered from advancing in the company." [Doc. 2-4, p. 3]. In one email, Plaintiff wrote:

> I have been wrongfully terminated. [A]s a result of retaliation for the second time within the past six months. There was a [*sic*] action plan and I complied with it. I have been targeted and harassed. However, . . . Manning encouraged his assistant[ ] [managers] to terminate me and hold me accountable for activity that goes outside the scope of my responsibility.

[Doc. 2-3, p. 5]. In light of the content discussed in Plaintiff's emails, Walmart concedes that he has established a prima facie case of retaliation, and again, Walmart's offers the

same reasons discussed above concerning Plaintiff's poor job performance to shove the analysis into the pretext inquiry. [Doc. 42-1, p. 14]. In this pretext inquiry, too, courts look to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" to unearth evidence of pretext. *Gogel*, 967 F.3d at 1136 (citation omitted). And while there are many similarities that align between a pretext analysis for a claim of employment discrimination and one of retaliation, when it comes the latter, "[a] reason is not pretext . . . unless it is shown *both* that the reason was false[] *and* that retaliation was the real reason." *Gogel*, 967 F.3d at 1136 (quoting *Springer*, 509 F.3d at 1349).

Walmart's proffered non-retaliatory reasons were simply those relating to the broad spectrum of Plaintiff's less-than-acceptable job performance, and other than his clear, subjective disagreement with them, Plaintiff has not shown that they are false. *See id.* at 1135 (quoting *Bryant*, 575 F.3d at 1308). At this late hour, to further expound on what Walmart thought of Plaintiff's job performance would be redundant. The record evidence is clear. Not only did Marshall—Plaintiff's first supervisor after Manning made him a department manager—have problems with Plaintiff's job performance but so did Reeves, and Hopkins, and Manning. [Doc. 42-1, p. 15]; [Doc. 42-3, ¶¶ 29–68]. That's four managers who had notable, *consistent* problems with Plaintiff's job performance in just over a three-year period of employment. [Doc. 42-3, ¶¶ 11, 68]. One of those managers went so far as to dub Plaintiff as "the worst performer of all the [d]epartment [m]anagers [he] supervised." [Doc. 46, Hopkins Decl., ¶ 11].

49

The evidence Walmart provided is consistent. Not one manager's perception of Plaintiff's job performance contradicts another's, and without, *inter alia*, inconsistences or contradictions, a reasonable factfinder could not find that Walmart's proffered non-retaliatory reasons—based on this record—are unworthy of credence. *Gogel*, 967 F.3d at 1136 (citation omitted). Thus, Walmart is entitled to summary judgment on Plaintiff's retaliation claim as well.

## <u>CONCLUSION</u>

Bottom line: No matter the theory, way, method, or route at his disposal, Plaintiff simply fails to show that he suffered unlawful employment practices when Walmart fired him for the second time. And, without such a showing, Walmart wins. The Court **GRANTS** Defendant Walmart, Inc.'s, Motion for Summary Judgment [Doc. 42]. The Clerk of Court is **DIRECTED** to **ENTER** Judgment accordingly and **CLOSE** this case.

**SO ORDERED**, this 22nd day of August, 2024.

*S/ Tilman E. Self, III*
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**